NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0736n.06

No. 14-4263

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 04, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SIMCO PEABODY COAL COMPANY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON PETITION FOR REVIEW FROM |
| DIRECTOR, OFFICE OF WORKERS' | ) | THE UNITED STATES DEPARTMENT |
| COMPENSATION PROGRAMS, UNITED | ) | OF LABOR, BENEFITS REVIEW |
| STATES DEPARTMENT OF LABOR and | ) | BOARD |
| JOHN W. RUBY, | ) | |
| | ) | |
| Respondents. | | |

BEFORE: COLE, Chief Judge; DAUGHTREY and DONALD, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Simco Peabody Coal Company petitions for review of a decision by the Benefits Review Board that upheld an administrative law judge's grant of black lung payments to John Ruby, a former coal miner, based upon a finding that Ruby was totally disabled due to legal pneumoconiosis. Simco Peabody relies upon the opinions of physicians who perform the company's consulting work in black lung cases on behalf of coal companies to argue that Ruby did not establish his entitlement to benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901-944, and its accompanying regulations. Although Simco Peabody's appellate brief purports to raise seven distinct issues for this court's consideration, those assignments of error can be distilled into a claim that the administrative law judge erred in giving inappropriate weight to the opinions of physicians who determined that

Ruby was entitled to the challenged benefits. For the reasons set out below, we conclude that substantial evidence supported the award of benefits and, therefore, affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Claimant's Employment History

John Ruby, born in May 1955, was employed as a miner by the Peabody Coal Company for two different stints. According to Ruby, he first began working at Peabody's Coshocton, Ohio, mine in the fall of 1974. As he explained:

> It was an underground mine with three sections. 12 men worked each section. I worked at the face of the mine, shooting and loading coal. I was responsible for drilling into the coal, loading the shot, firing it and then loading the coal into buggies which took the coal to the beltline. At various times, I had to also shovel coal back onto the belt when it spilled and sometimes I was required to rockdust by hand. I worked six days a week, and sometimes on Sunday. About one-quarter of the time I was at the mine during this period, I worked a double shift. I ate a lot of coal dust on this job. We shot and loaded 500 tons of coal per day and therefore had to work fast. We were issued masks, which I wore, but they quickly plugged up with coal mine dust, which made them ineffective. The mine shut down on October 28, 1978.

Following the closing of the Coshocton mine, Ruby obtained other employment outside the mining industry. In the spring of 1980, however, the mining company called Ruby back to work, this time at its Sunnyhill mine in New Lexington, Ohio, where the claimant worked until that mining operation shut down in early 1982. Under penalty of perjury, Ruby described his work at the Sunnyhill mine as follows:

> This also was an underground mine, where the coal was 38-40 inches high. I worked at the face of the mine, drilling into the coal, operating the cutting machine and sometimes running the buggy loaded with coal. I also did some maintenance work here. When I drilled coal, I used a machine called a coal drill, which included a ten-foot long auger. After I drilled holes in the coal, I loaded the holes with dynamite. As part of my job, I had to haul explosives into the site where we were drilling. The explosives came in fifty pound boxes. Because the coal was low, I had to haul these boxes of explosives in while on my knees or by duckwalking. I hauled other equipment as well. When I operated the cutting machine, it was very dusty. My face was about four feet from where the dust was

being generated by the cutting machine. When I ran the cutting machine, I had to personally lift and maneuver the electrical cables that supplied power to the machine. These had to be lifted and pushed out of the way as the cutting machine operated. The cables were in mud and water and they were very heavy. It took all the strength I could muster in order to move these cables. When I drove the buggies, it was also dusty as the coal from the buggies would fly into your face as you drove the coal to the beltline. I also had to shovel spillage from the buggies. I worked one shift, usually six days a week at the mine. I was regularly required to lift and carry fifty pounds in these jobs and do a lot of shoveling at a fast pace.

**B. Medical Evidence Presented to the Administrative Law Judge**

Although Ruby did not engage in further mining activities after 1982, and although he never smoked cigarettes, cigars, or pipes, he developed severe respiratory problems, such that he has been unable to work since 2009. Thus, in September 2009, he filed a claim for black lung benefits with the Department of Labor's Office of Workers' Compensation Programs, alleging that he suffered from shortness of breath, wheezing, and chest pains. As part of the claims procedure, Ruby submitted to a battery of tests over the years.

In November 2009, Ruby was seen by Dr. Paul Knight, who is board-certified in internal medicine. During that visit, Ruby underwent a chest x-ray, a pulmonary function test, an arterial blood-gas test, an electrocardiogram, and a physical examination. Knight noted that Ruby claimed he became short of breath after walking only one block, after climbing just five or six stairs, and after moderate exertion, and that, although Ruby was able to lift and carry his groceries, he "couldn't do that repetitively." Ruby also reported that he suffered from diabetes, occasional wheezing, coughing, chest pain, and sensitivity to smoke and perfumes. Although the results of Ruby's chest x-ray, blood-gas test, and electrocardiogram all were within normal limits, Knight documented "[m]oderate obstruction and mild to moderate restriction" in the pulmonary function test.

Almost three years later, Dr. William Clapp, the medical director of the pulmonary physiology laboratory at a Chicago hospital, reviewed the results of that 2009 pulmonary function test and noted that Knight had overseen five spirometric[1] trials on Ruby *prior to* treating him with bronchodilators and three additional *post-bronchodilator* trials. According to Clapp's analysis of the results of the five pre-bronchodilator trials, although there was no evidence that Ruby hesitated during his breathing, three of the results were not acceptable under Department of Labor standards—one because Ruby coughed during the trial, one due to "glottis closure," and one because of the "poor effort" made by the claimant. Clapp also found that one of the three post-bronchodilator trials was unacceptable, both because of some hesitation in Ruby's breathing and because Ruby's effort during the test was "variable." Nevertheless, Clapp offered his opinion that the studies were valid under Department of Labor criteria because of the minimal variability in the FEV1[2] values in three of the four acceptable trials.[3]

Based upon his physical examination of Ruby and upon the results of the valid pulmonary function test, Knight concluded that Ruby suffered from chronic obstructive pulmonary disease (COPD) of moderate severity. Furthermore, noting that Ruby is a non-smoker, Knight noted that "[t]he only apparent etiology for [Ruby's] lung disease is dust exposure in the course of work over several years," and that the "impairment is quite significant and would be considered totally disabling for his last significant job in the coal mines, both from an exertion standpoint and from the ability to tolerate more atmospheric exposure."

---

[1] "Spirometry" is defined as the "[m]easurement of breathing-power or lung-capacity." *Oxford English Dictionary (2015)*, www.oed.com.

[2] FEV1 values denote the "forced expiratory volume in one second" exhaled by the patient. *See* 20 C.F.R. § 718.103(a). In the four "acceptable" 2009 trials, Knight documented FEV1 values for Ruby of 1.46 liters, 1.54 liters, 1.56 liters, and 1.57 liters.

[3] In March 2010, in order to ensure the validity of the earlier pulmonary testing, the Department of Labor had Dr. Adi Gerblich, a physician with board certification in internal medicine, pulmonary medicine, and critical care, examine the results of Knight's 2009 pulmonary function studies. After Gerblich reviewed the documentary evidence supplied to him, he also concluded that the "[v]ents are acceptable."

Rather than concur in the medical opinion offered by Knight, Simco Peabody hired two medical experts of its own in an effort to defeat Ruby's claim for benefits. Dr. David Rosenberg undertook his own evaluation of John Ruby in March 2011 to determine whether Ruby had coal workers' pneumoconiosis caused by past exposure to coal mine dust. Rosenberg concurred in large part with the medical and occupational background that Knight reported for the miner. However, Rosenberg challenged the validity of the pulmonary function tests conducted in 2009, suggesting that the results of those tests "revealed incomplete efforts" on Ruby's part. Rosenberg also administered his own pulmonary function test, noting that Ruby's "efforts were incomplete and quite variable" on that test as well, and that Ruby "had a fair amount of coughing during the evaluation." Nevertheless, prior to the administration of any bronchodilators, Ruby's FEV1 value on Rosenberg's test was 2.27 liters, a value significantly greater than the highest (1.57-liter) result recorded by Knight in 2009. When, *after* the administration of bronchodilators, which should have increased Ruby's exhalation abilities, Ruby recorded an FEV1 value of only 1.55 liters, Rosenberg aborted the study.

Rosenberg concluded that Ruby "possibly has a degree of airflow obstruction," but that, in any event, "Ruby does not have clinical or legal" pneumoconiosis, and "he is not disabled from performing his previous coal mine job or other similarly arduous types of labor." Rosenberg did concede that Ruby potentially suffered from asthma, which "would explain the improvement in his spirometric values from several years ago to the present time."

Rosenberg also offered deposition testimony that was considered by the administrative law judge in this matter. In that testimony, he reiterated his opinion that Ruby does not suffer from a totally disabling pulmonary impairment, that Knight's 2009 pulmonary function tests must be deemed invalid due to incomplete effort on Ruby's part, and that a diagnosis of legal

pneumoconiosis cannot be substantiated given the fact that Ruby's pulmonary-function-test values improved dramatically between 2009 and 2011. He did admit, however, that "virtually all of [his] consulting expert work in the black lung area is done on behalf of coal operators or their insurers," and that if Knight's 2009 tests were considered valid, the FEV1 values obtained in those tests would indicate severe airway obstruction.

Simco Peabody's second expert, Dr. George Zaldivar, concurred with Rosenberg that if the 2009 pulmonary function tests were considered valid, the results obtained would indicate a significant, even disabling, pulmonary obstruction. Zaldivar claimed, however, that Knight's pulmonary function tests on Ruby were "absolutely invalid" because Ruby's effort on exhalation was "dismal," inconsistent, and not performed with maximum effort. He also believed that Rosenberg's pulmonary function test must be considered invalid, especially because it was unlikely that Ruby's post-bronchodilator test values could be lower than the values obtained during testing before administration of the medication.

Ignoring the results of the 2009 and 2011 pulmonary function tests, Zaldivar still concluded that Ruby did not suffer from pneumoconiosis, but rather from mild asthma that would not prevent him from performing his past coal-mine work. Zaldivar based that opinion on the fact that Ruby had been taking asthma medications that are used to treat inflammatory diseases between the time of the 2009 and 2011 pulmonary function tests, and that his 2011 test results were "practically normal."

Following the submission of reports by both Rosenberg and Zaldivar, Dr. Knight responded by letter to the criticisms raised by the other two physicians. He first countered Zaldivar's claim that Ruby's effort on the 2009 pulmonary function tests was "dismal" by indicating that he (Knight) had contacted the technician who performed the 2009 tests and that

the technician "found Mr. Ruby's effort to be full, meaning acceptable." Knight also disputed the claims made by the coal company doctors that the results of the 2009 testing showed that Ruby hesitated during expiration. Knight's review of the test results confirmed his belief that any hesitation shown was "very minor" and did not affect the validity of the results.

Additionally, Knight disputed the validity of Rosenberg's 2011 tests for the same reason expressed by Zaldivar, namely that the test must be called into question because Ruby's expiration results were significantly worse *after* administering bronchodilators. Knight further explained that Ruby's improved performance on part of the 2011 pulmonary function test did not necessarily mean that Ruby's condition had not deteriorated, but only that Ruby had been taking medicine that "opens the lungs and permits better lung function" immediately prior to submitting to the testing.

Finally, Knight expressed disagreement with Rosenberg's conclusion that Ruby must be considered an asthmatic simply because he had been prescribed certain medications that Rosenberg believed were used only to treat asthma. Knight reaffirmed that neither he nor any other doctor has treated Ruby for asthma and that the medications used by Ruby have been prescribed "for many patients with obstructive lung disease, like Mr. Ruby, who are not asthmatics. The effect of these medicines is to open the airways and this has proved valuable for patients who have coal-dust induced obstruction, cigarette smoke induced obstruction, as well as other forms of obstruction, including asthma."

The parties also placed before the administrative law judge a report prepared in May 2012 by Dr. Shirley Conibear, a medical review officer who is board-certified in occupational medicine. Of relevance to the disputes at issue before this court, Conibear stated that she had reviewed the letters and data provided by both Knight and Rosenberg before noting that the

supposed improvement in Ruby's pulmonary-function-test values in 2011 can be explained by the fact that the claimant "was being treated with bronchodilators and inhaled steroids at the time Dr. Rosenberg saw him in March[ ] 2011." Conibear then concluded that her review of the records indicated that Ruby was then "totally disabled from his last job in the coal mine" "due to COPD/emphysema which is a direct result of his work in the coal mines."

## C. Administrative Law Judge's Decision

Presented with this information, the administrative law judge issued lengthy and thorough findings of fact and conclusions of law. Despite the fact that Ruby claimed to have worked in the coal mines for eight years, the administrative law judge used Social Security records to calculate percentages of years actually worked by dividing Ruby's total earnings for particular years by his base annual wage. Doing so, the administrative law judge credited Ruby with 5.44 years of underground coal mine employment, rather than the eight years that all parties accepted as an appropriate calculation.[4]

After detailing the evidence before him and the framework for deciding black-lung-benefits cases, the administrative law judge concluded that Ruby could not establish that he suffered from "clinical pneumoconiosis" as that condition is defined by the relevant regulations. Turning to an examination of whether Ruby nevertheless could support a showing of "legal pneumoconiosis," the administrative law judge accorded full probative weight to the opinions of Drs. Knight and Conibear that Ruby suffered from the legal, nonclinical form of the debilitating pulmonary condition. In addition, he gave no probative weight to the determinations of Drs. Rosenberg and Zaldivar that Ruby did *not* suffer from legal pneumoconiosis. He discounted

---

[4] Ruby asserts that the administrative law judge inappropriately failed to consider his coal mine employment during the years 1974-1977 in arriving at the figure of 5.44 years. However, the administrative law judge stated clearly in his decision that he credited "Claimant with three years and three months of coal mine employment from 1974 through 1977." In any event, Ruby recognizes that whether his creditable service is 5.44 years or eight years is irrelevant, "given the result reached" by the administrative law judge.

Rosenberg's opinion because the doctor based it in large part on the improved pulmonary-function-test scores in the 2011 testing, even though Rosenberg himself admitted in his deposition that Ruby's use of bronchodilators prior to the administration of the test could account for the change in FEV1 values. He refused to give any probative weight to Zaldivar's opinion because Zaldivar had concluded, contrary to the administrative law judge's own determination, that the 2009 pulmonary function test was invalid.

Furthermore, the administrative law judge concluded that Ruby's legal pneumoconiosis arose out of coal mine employment. In doing so, the administrative law judge relied upon the fact that a finding of "legal pneumoconiosis," as defined in 20 C.F.R. § 718.201(a)(2), inherently presumes that medical evidence and reasoned medical opinion establish that the disease arose at least in part out of coal mine employment. Finally, giving more weight to the opinions of Knight and Conibear, the administrative law judge determined that Ruby had established by a preponderance of the evidence that he was totally disabled from pneumoconiosis, and thus granted Ruby black lung benefits forward from September 2009, "the month and year in which Claimant filed this claim for benefits."

Simco Peabody appealed the administrative law judge's decision to the Benefits Review Board, contending that the administrative law judge erred in his evaluation of the pulmonary function tests, in his evaluation of the medical-opinion evidence, in his determination of total disability, and in his conclusion that Ruby's disability was due to pneumoconiosis. The Board, however, unanimously affirmed the administrative law judge's decision in all respects, leading Simco Peabody to file a petition for review with this court.

## II.  DISCUSSION

### A. Standard of Review

In reviewing administrative decisions rendered pursuant to the Black Lung Benefits Act, we examine the legal conclusions of the Benefits Review Board *de novo*.  *Brandywine Explosives & Supply v. Dir., Office of Workers' Comp. Programs*, 790 F.3d 657, 664 (6th Cir. 2015).  "On factual issues, the court, like the Board, determines whether the ALJ—not the Board—had substantial evidence upon which to base his or her decision."  *Id.* (internal quotation marks and citations omitted).  The United States Supreme Court defines "substantial evidence" to mean "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation marks and citations omitted).  Here, because Simco Peabody does not challenge any legal determination of the Board, we need decide only whether the administrative law judge's findings "are supported by substantial evidence and accord with the applicable law."  *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 633 (6th Cir. 2009).

### B. Framework of Black-Lung-Benefits Cases

The Black Lung Benefits Act was passed and enacted to "provide benefits . . . to coal miners who are totally disabled due to pneumoconiosis."  30 U.S.C. § 901(a).  "Pneumoconiosis" is defined succinctly in the Act as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  30 U.S.C. § 902(b).  As might be expected, however, deciding whether a miner suffers from pneumoconiosis and whether the miner is entitled to receipt of benefits is not a straightforward determination.

Generally, in order "[t]o establish entitlement to benefits, the claimant must prove by a preponderance of the evidence that (1) he has pneumoconiosis, (2) his pneumoconiosis arose in whole or in part out of his coal mine employment, (3) he is totally disabled, and (4) the total disability is due to pneumoconiosis." *Cent. Ohio Coal Co. v. Dir., Office of Workers Comp. Programs*, 762 F.3d 483, 486 (6th Cir. 2014). In this case, Simco Peabody challenges the administrative law judge's determination that Ruby has satisfied each of these claim elements.

## 1. Does Ruby Suffer from Pneumoconiosis Arising from Coal Mine Employment?

Although 30 U.S.C. § 902(b) defines "pneumoconiosis" broadly, the implementing regulations promulgated by the Department of Labor's Office of Workers' Compensation Programs add sufficient details to aid in determining entitlement to benefits under the Act. Pursuant to those regulations, the statutory definition of "pneumoconiosis" is considered to include both medical, or "clinical," pneumoconiosis and statutory, or "legal," pneumoconiosis. "Clinical pneumoconiosis" "refers to a specific set of enumerated diseases," *Brandywine Explosives & Supply*, 790 F.3d at 661, that are "characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1). "Legal pneumoconiosis" is defined more broadly, however, to include, but not be limited to, "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a)(2). When considering whether such a pulmonary disease arose out of coal mine employment, a finder of fact examines whether "any chronic pulmonary disease or respiratory or pulmonary impairment [was] significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. § 718.201(b).

The applicable regulations offer four ways in which a claimant can establish the existence of pneumoconiosis. 20 C.F.R. § 718.202(a)(1)-(4). Three of these four alternatives—chest x-rays, biopsies or autopsies, and certain regulatory presumptions—are not relied upon by Ruby in this litigation to support his claim for benefits. However, pneumoconiosis also can be shown by "objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance test, physical examination, and medical and work histories," if "supported by a reasoned medical opinion." 20 C.F.R. § 718.202(a)(4).

All parties and decision-makers in this litigation concur that Ruby's blood-gas studies and electrocardiogram did not yield results supporting a finding of legal pneumoconiosis. Nevertheless, Dr. Knight still was able to diagnose Ruby with "COPD of moderate severity, based on history and physical examination, [and] pulmonary functions." In doing so, Knight took into account the fact that Ruby was a lifelong non-smoker, yet after working in coal mines for portions of eight years, suffered from wheezing, shortness of breath, coughing, and occasional chest pain. Knight also relied on pulmonary-function-test results that indicated a mild restriction of total lung capacity and an obstruction to airflow. Similarly, Dr. Conibear concluded that Ruby suffered from legal pneumoconiosis, based upon her review of his medical and employment history, his productive cough and shortness of breath, and his "abnormal lung volumes," as determined by use of the Hankinson reference range preferred by the American Thoracic Society to interpret pulmonary-function-test results.[5]

Even Rosenberg and Zaldivar, Simco Peabody's own medical experts, did not dispute Ruby's employment history or medical symptoms. Furthermore, both Rosenberg and Zaldivar conceded that, if the pulmonary function test conducted by Knight in 2009 is considered to be

---

[5] The other medical experts who offered testimony or opinions in this matter used instead the Knudson reference range that is used more commonly in black lung examinations to interpret pulmonary-function-test results.

valid—a concession they were not willing to make, other than for hypothetical purposes—Ruby suffered from severe, significant, or disabling pulmonary obstruction. Given that information, especially if the 2009 test is considered valid, the administrative law judge had before him substantial evidence to conclude that Ruby established that he suffered from legal pneumoconiosis.

Rosenberg argued, however, that the 2009 test was invalid because the results revealed that Ruby hesitated during expiration and that his effort in the study was "incomplete." Likewise, Zaldivar based his belief that Knight's testing was not valid on his opinion that Ruby's effort was "dismal," inconsistent, and less than optimal. The administrative law judge considered the coal company's evidence offered to show the invalidity of the 2009 testing but ultimately concluded that the test was nevertheless valid. In doing so, the administrative law judge simply chose, as was his prerogative, to give less credence to Rosenberg's and Zaldivar's claims of invalidity that were based on allegations of Ruby's lack of effort even in light of the countervailing evidence both from Dr. Clapp, who determined that the test was valid, and from Knight, who contacted the technician who conducted the test and who stated that Ruby exhibited full effort during the examination. Moreover, the administrative law judge credited Knight's statement that the doctor had reviewed the 2009 study results and found no evidence of hesitation on Ruby's part. Knight also maintained that the test results satisfied Department of Labor standards and explained:

> Mr. Ruby exhaled for longer than seven seconds and reached a plateau at the end of his expiration. There was no hesitation at all on the pre-bronchodilator maneuvers at all and so both the pre-bronchodilator FEV1 and FVC values are valid. There was only some very minor hesitation during the post-bronchodilator maneuvers but long after the first second (which is the only time period that matters for the post-bronchodilator FEV1) and well before the last two seconds so that the post-bronchodilator FVC value is also valid. This hesitation is very minor and does not affect the validity of the FEV1 and FVC values.

Substantial evidence in the record thus supports the administrative law judge's conclusion that the 2009 pulmonary function test was valid. Evidence of that validity, in conjunction with the opinions of. Knight and Conibear and the begrudging concessions of. Rosenberg and Zaldivar, is sufficient to affirm the administrative law judge's finding that Ruby suffered from severe pulmonary obstruction.

However, for such a pulmonary condition to constitute "legal pneumoconiosis" requires proof that the disease or impairment actually arose out of coal mine employment. Simco Peabody claims that the administrative law judge erred in crediting Knight and Conibear's opinions regarding the existence of legal pneumoconiosis because those doctors claimed that exposure to coal mine dust only "potentially" caused Ruby's pulmonary obstruction. According to the coal company, "Both physicians referenced the fact that the Claimant was a non-smoker, but did no further analysis." That assertion is based, in large part, on the company's misguided implication that Knight and Conibear believed that coal dust is responsible "for every instance of non-tobacco related lung disease."

The record does not support Simco Peabody's leap of logic. In fact, both Knight and Conibear considered, but rejected, asthma—a non-tobacco-related lung disease—as a potential cause of Ruby's condition. Then, relying upon the concrete evidence of Ruby's pulmonary symptoms and the lack of any evidence that past or present smoking could have contributed to the verifiable discomfort the claimant experienced, Knight concluded that "[t]he only apparent etiology for this person's lung disease is dust exposure in the course of work over several years." Such an analysis is far removed from a complete failure to consider alternatives and a belief that coal dust exposure is the cause of all lung diseases found in non-smoking miners.

Furthermore, the administrative law judge did not err in giving no credence to Rosenberg's assertion in his deposition that Ruby's pulmonary issues were unrelated to his coal mine employment because "any cough or sputum production [Ruby] has two decades after he has left the coal mine exposure would not [be] related to past coal mine dust exposure." Applicable regulations dispute the legitimacy of Rosenberg's suggestion. Indeed, 20 C.F.R. § 718.201(c) provides explicitly that pneumoconiosis is "a latent and progressive disease which may first become detectable *only after the cessation of coal mine dust exposure*." (Emphasis added.)

The administrative law judge's finding that Ruby suffered from legal pneumoconiosis is supported by substantial evidence in the record. Consequently, Simco Peabody's efforts to undermine that determination are without merit.

**2. Does the Record Establish That Ruby Is Totally Disabled?**

The bulk of Simco Peabody's petition for review involves challenges to the administrative law judge's determination that Ruby was totally disabled. In contesting that factual finding, Simco Peabody argues that the administrative law judge erred: (1) in ignoring the 2011 pulmonary function test's finding of no disability; (2) in not applying the "later-is-better" rule to the 2011 test results; (3) in crediting the testimony of Dr. Conibear even though she used disability standards that differed from those approved by the Department of Labor; (4) in crediting the testimony of doctors who relied on information gained from review of the non-qualifying, yet valid, 2009 test; (5) in crediting opinions of total disability that were not based on objective medical testing; and (6) in rejecting the opinions of Rosenberg and Zaldivar simply because they found the 2009 test invalid when the administrative law judge himself

determined that the results of that test would not qualify, in the absence of other findings, as evidence of total disability.

For purposes of this litigation, the parties agree that Ruby should be considered totally disabled if he suffers from "a pulmonary or respiratory impairment which, standing alone, prevents [him] . . . [f]rom performing his . . . usual coal mine work." 20 C.F.R. § 718.204(b)(1)(i). The regulations again provide four methods for establishing such a disability. Two of those methods—arterial blood-gas-test values and medical evidence of "cor pulmonale with right-sided congestive heart failure"—are not relevant here. However, a claimant also may seek to prove total disability through pulmonary-function-test results or through other diagnostic techniques. 20 C.F.R. § 718.204(b)(2)(i) and (iv).

### a. Use of Pulmonary-Function-Test Results

As a prerequisite to relying upon pulmonary-function-test results to establish total disability in black lung cases, a claimant must be able to point to results showing FEV1 values equal to or less than base values listed in a Code of Federal Regulations table for individuals "of the miner's age, sex, and height." 20 C.F.R. § 718.204(b)(2)(i). For a male of Ruby's age and height, the FEV1 value of any pulmonary function test must not exceed a level of 1.91 liters if the test if to qualify as a method of showing total disability. *See* 20 C.F.R. Pt. 718, App. B (Table B1). Ruby easy met this threshold requirement. In fact, the highest FEV1 values for the trials deemed acceptable from Knight's 2009 test were 1.54 liters (pre-bronchodilator) and 1.57 liters (post-bronchodilator).[6]

In addition, however, in order to establish total disability, a claimant must submit test results that meet one of three other benchmarks: (1) values equal to or less than those listed in

---

[6] Rosenberg recorded FEV1 values in his 2011 test of 2.27 liters (pre-bronchodilator) and 1.55 liters (post-bronchodilator).

the appropriate table "for an individual of the miner's age, sex, and height for the FVC test"[7];

(2) values equal to or less than those listed in the appropriate table "for an individual of the

miner's age, sex, and height for the MVV test"[8]; or (3) "[a] percentage of 55 or less when the

results of the FEV1 test are divided by the results of the FVC test." 20 C.F.R.

§ 718.204(b)(2)(i)(A), (B), and (C). The evidence presented to the administrative law judge

indicates that Ruby failed to establish total disability by any of these three methods.

### b. Reliance Upon Diagnostic Techniques

Because Ruby was unable to rely upon pulmonary function testing, arterial blood-gas

tests, or the presence of cor pulmonale to establish total disability, the success of his claim for

black lung benefits hinged upon his ability to comply with the provisions of 20 C.F.R.

§ 718.204(b)(2)(iv). Pursuant to that subsection of the regulation:

> When total disability cannot be shown under paragraphs (b)(2)(i), (ii), or (iii) of
> this section, or where pulmonary function tests and/or blood gas studies are
> medically contraindicated, total disability may nevertheless be found if a
> physician exercising reasoned medical judgment, based on medically acceptable
> clinical and laboratory diagnostic techniques, concludes that a miner's respiratory
> or pulmonary condition prevents or prevented the miner from engaging in [his
> usual coal mine work].

To support his claim for benefits, Ruby highlighted the medical reports of Knight and

Conibear. Simco Peabody counters the assertion of total disability with the contrary opinions of

Rosenberg and Zaldivar. As has been detailed previously, Knight and Conibear based their

determinations of total disability on the results of Knight's physical examination of Ruby and on

the doctors' review of the claimant's complaints of wheezing, coughing, and chest pain, as well

as on Ruby's description of his prior coal mine work. In light of their medical findings and the

fact that Ruby asserted that he had difficulty climbing stairs, could not walk even one block on a

---

[7] "FVC" stands for "forced vital capacity."
[8] "MVV" stands for "maximum voluntary ventilation."

level sidewalk without becoming short of breath, and could not lift a bag of groceries repeatedly,

Knight and Conibear made reasoned medical judgments that the claimant no longer could crawl

or duckwalk through dust-filled coal mines carrying or dragging 50-pound boxes of explosives.

Furthermore, even though the 2009 pulmonary function study performed on Ruby at Knight's

direction was determined to be non-qualifying for purposes of the Act, both Knight and Conibear

considered that Ruby's FEV1/FVC percentage of 56 was as close to a qualifying pulmonary

function study as possible without actually qualifying. The administrative law judge noted the

bases for the opinions of Knight and Conibear and concluded that they adequately supported the

findings of total disability.

### c. Simco Peabody's Objections to the Finding of Total Disability

Simco Peabody argues that the administrative law judge erred in crediting the medical

opinions of Knight and Conibear when those doctors considered the results of the

2009 pulmonary function study in forming their medical diagnoses. According to the coal

company, because the administrative law judge correctly determined that the study did not meet

the qualifying standards set forth in the regulations to support, on its own, a finding of total

disability, reliance by Knight and Conibear upon that 2009 test was improper. However, Simco

Peabody's disagreement with the administrative law judge's recognition of the validity of the

non-qualifying study's results in formulating a reasoned medical opinion is ill-founded and

contrary to established circuit precedent. In *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 577

(6th Cir. 2000), for example, we reviewed a denial of benefits to a miner that had been based

upon an administrative law judge's rejection of a physician's determination of total disability

that "relied, in part, on a pulmonary function study that 'yielded numbers above the qualified

amount.'" According to our analysis in *Cornett*:

> This is clearly an inappropriate reason to reject a physician's opinion because, as the regulations explicitly provide, a doctor can make a reasoned medical judgment that a miner is totally disabled even "where pulmonary function tests and/or blood-gas studies are medically contraindicated." 20 C.F.R. § 718.204(c)(4). Under the regulations, [the physician] was entitled to base a reasonable opinion on non-qualifying test results, *see Jonida Trucking, Inc. v. Hunt*, 124 F.3d 739, 744 (6th Cir. 1997), and the ALJ erred by rejecting his opinion for this reason.

Thus, substantial evidence in the record supports the decision of the administrative law judge that the opinions of Knight and Conibear were reasoned, valid, and based on objective medical testing.

Similarly, because the valid, although non-qualifying, 2009 test results properly could be considered in forming a reasoned medical opinion regarding Ruby's total disability, the administrative law judge was justified in questioning the validity of the medical opinions of. Rosenberg and Zaldivar. Both Rosenberg and Zaldivar had testified during their depositions that if the 2009 test was valid—a factual finding actually made by the administrative law judge—they would consider Ruby to be suffering from severe, even disabling, pulmonary obstructions. Nevertheless, when pressed, they concluded that Ruby was not totally disabled due to pneumoconiosis. Thus, once the administrative law judge concluded that the 2009 test indeed was valid, he was justified, if not compelled, to conclude that Rosenberg's and Zaldivar's opinions regarding Ruby's total disability were entitled to little credence or weight.

Nor is there any merit to Simco Peabody's argument that the administrative law judge improperly ignored the results of the 2011 pulmonary function test conducted during Rosenberg's examination of Ruby. Far from ignoring the results of that study, the administrative law judge engaged in extensive analysis of that test and a discussion of why the test results were of little value in determining whether Ruby was totally disabled as a result of pulmonary obstruction. Significantly, even though the pre-bronchodilator studies in 2011 resulted in non-

qualifying levels, Rosenberg admitted that Ruby's efforts during the test were "incomplete and quite variable." In addition, Ruby suffered from "a fair amount of coughing during the evaluation," further skewing the results. Then, when post-bronchodilator results proved significantly worse than the pre-bronchodilator readings—an illogical development—Rosenberg aborted the entire test. Furthermore, Rosenberg admitted that medical records showed that Ruby was using bronchodilators and inhaled steroids for some unspecified period of time prior to the initiation of the 2011 test. Not surprisingly, he also conceded such usage could explain why the claimant performed better on that later evaluation than he did in 2009. Clearly, the administrative law judge did not ignore the results of the 2011 pulmonary function test; rather, he recognized the flaws inherent in its administration, found it invalid, and gave little credence to its results or to the opinion of physicians who sought to use those results as a valid medical evaluator.

The coal company puts forward two other arguments in its attempt to validate *some* of the results of the 2011 pulmonary function test that even its own experts found flawed. First, the company proposes that the administrative law judge improperly considered the prior use of bronchodilators to invalidate the 2011 study because the post-bronchodilator results in the *2009* study did not show significant improvement in Ruby's lung capacity. Consequently, argues Simco Peabody, Ruby's use of bronchodilators prior to the 2011 test cannot alone be used to explain the claimant's improved test levels. The company fails to take into account, however, the logical explanation that *prolonged* use of bronchodilators and inhaled steroids can, over time, ease breathing in individuals suffering from pulmonary afflictions.[9]

---

[9] Even if use of bronchodilators led to a lessening of Ruby's breathing difficulties, such a fact would not call into question the validity of the administrative law judge's finding of total disability. As the Benefits Review Board has ruled, "In making disability determinations, the question is whether the miner is able to perform his job, not whether

Second, the company insists that application of a "later-is-better rule" necessarily would lead to the conclusion that the results of the 2011 test, not the 2009 test, should be given greater weight. The shortest and best reply to this contention is that the 2011 test was deemed invalid and, therefore, never could be considered "better" than another valid test, regardless of its timing.

Simco Peabody's final challenge to the administrative law judge's finding of total disability in this case involves its disagreement with standards of interpretation used by Dr. Conibear in her review and analysis of the 2009 and 2011 pulmonary function tests. The coal company surmises that in concluding that Ruby suffered from legal pneumoconiosis and was totally disabled from it, Conibear erroneously relied upon the so-called Hankinson reference range that "uses Lower Limit of Normal values," rather than upon the Department of Labor-approved Knudson reference range that "uses fixed cut off limits for normal values." Consequently, argues Simco Peabody, the administrative law judge erred in crediting Conibear's opinion on total disability.

It is true that Conibear questioned Rosenberg's use of the Knudson reference range to interpret the results of the 2011 pulmonary function test and offered that, "[a]pplying the American Thoracic Society's preferred Hankinson 1999 reference range . . ., it can be seen that even though there was improvement compared to the Nov. 12, 2009 [test], Mr. Ruby still has levels below the population-based lower limit of normal value." Significantly, however, Conibear neither stated nor implied that reference to the Hankinson values provided the sole, or even the most important, basis for her medical opinions of Ruby's condition. Instead, her finding of total disability was based more inclusively upon Ruby's "[s]ymptoms of dyspnea on exertion with sedentary activities [and] [o]bjective findings on his spirometry, lung volumes,

---

he is able to perform his job after he takes medication." *Maynard v. Pen Coal Corp.*, BRB No. 09-0599 BLA, 2010 WL 3073532, at *4 n.3 (BRB July 27, 2010).

blood gasses, physical examination, and METs developed during the stress test that would

preclude the kind of exertion required in his last coal mine job." Thus, as the Benefits Review

Board concluded on its review, "the administrative law judge's error, *if any*, in failing to address

Dr. Conibear's use of the Hankinson standards, is harmless." (Emphasis added.)

### 3. Was Ruby's Total Disability Due to Pneumoconiosis?

The final element of a claimant's case for benefits under the Black Lung Benefits Act is

the requirement that the miner establish by a preponderance of the evidence that total disability

was *due to* pneumoconiosis. The standards for making such a determination are set forth in

20 C.F.R. § 718.204(c)(1):

> A miner shall be considered totally disabled due to pneumoconiosis if
> pneumoconiosis . . . is a substantially contributing cause of the miner's totally
> disabling respiratory or pulmonary impairment. Pneumoconiosis is a
> "substantially contributing cause" of the miner's disability if it:
> (i) Has a material adverse effect on the miner's respiratory or pulmonary
> condition; or
> (ii) Materially worsens a totally disabling respiratory or pulmonary impairment
> which is caused by a disease or exposure unrelated to coal mine employment.

Both Knight and Conibear concluded that exposure to coal mine dust caused Ruby's

COPD and other pulmonary problems. The reasoned opinions of those medical experts provide

the substantial evidence necessary to affirm the conclusion reached by the administrative law

judge that Ruby was totally disabled due to pneumoconiosis. The contrary opinions of

Rosenberg and Zaldivar do not detract from that finding given the fact that the coal company

experts failed even to find that Ruby suffered from pneumoconiosis.

### III. CONCLUSION

For the reasons set out above, we conclude that substantial evidence in the record

supports the finding of the administrative law judge both that John Ruby is totally disabled due

to pneumoconiosis caused by his prior coal mine employment and that he is entitled to black

lung benefits to be paid by Simco Peabody.  We therefore DENY the coal company's petition for

review in this matter.